**Gen. 93]**                                                                **93**

# TRANSPORTATION

### VEHICLE LAWS – TOWING FEES – HOW TO DETERMINE THE PERMISSIBLE FEES FOR TRESPASS TOWING IN LOCAL JURISDICTIONS UNDER SECTION 21-10A-04 OF THE TRANSPORTATION ARTICLE

April 13, 2022

*The Honorable Brandon M. Scott*
*Mayor, Baltimore City*

You have asked for an opinion of the Attorney General as to how to interpret certain towing-fee-related provisions in § 21-10A-04 of the Transportation Article. That statute imposes constraints on the fees that can be charged for the towing of vehicles from private parking lots, a practice that is often called "trespass towing." Those constraints, in turn, are largely based on the fees for "impound towing," i.e., the removal of vehicles from public streets. More specifically, the statute generally sets the permissible fee for trespass towing as double the "total fees normally charged or authorized by the political subdivision for the public safety impound towing of vehicles," Md. Code Ann., Transp. ("TR") § 21-10A-04(a)(1)(i), plus "the fee normally charged or authorized by the political subdivision from which the vehicle was towed for the daily storage of impounded vehicles," TR § 21-10A-04(a)(1)(ii). But the statute provides a different maximum fee for trespass towing—$250 for towing a vehicle and $30 per day for storage—"[i]f a political subdivision does not establish a fee limit for the public safety towing, recovery, or storage of impounded vehicles." TR § 21-10A-04(a)(1)(iii).

Under that scheme, your first question is which towing-related fees may be doubled under subparagraph (a)(1)(i) of the statute as the "total fees normally charged or authorized by the political subdivision for the public safety impound towing of vehicles." That is, do the "total fees" that may be doubled include only fees that are charged for the actual towing of the vehicle, or can they also include storage fees, fees for notice, or administrative fees that a local jurisdiction might charge in connection with impound towing? Your second question is about the meaning of the term "normally charged or authorized" in TR §§ 21-10A-04(a)(1)(i) and (ii), and how that term relates to the term "fee limit" found in § 21-10A-04(a)(1)(iii). In other words, was the term "fee limit" in (a)(1)(iii) intended as a shorthand to refer back to the fee "normally charged or authorized" by the jurisdiction for impound

towing mentioned earlier in that subsection—such that the default fee in (a)(1)(iii) applies only if the jurisdiction does not have a fee "normally charged or authorized"—or was the term "fee limit" intended to mean something else? You explain that, at Baltimore City Council committee hearings held to consider recent legislation that would amend local towing laws, testimony from members of the towing industry revealed that there are conflicting interpretations of § 21-10A-04.

In our opinion, as to your first question, the "total fees" referred to in TR § 21-10A-04(a)(1)(i) clearly do not include fees for storage or notice, or fines owed for traffic or parking violations. And although less clear, the term "total fees" likely also does not include administrative fees charged by a political subdivision for public safety impound towing. Rather, both the text and the legislative history of the provision indicate that the "total fees" include those fees directly related to the actual towing of a vehicle, such as fees for hook-up, mileage, or time. As to your second question, our conclusion is that the fees "normally charged or authorized" by a jurisdiction for public safety impound towing refer to the fees for a normal tow set by the jurisdiction in its local code or by some other formal fee-setting mechanism and that, so understood, those fees serve as a type of "fee limit" for purposes of TR § 21-10A-04(a)(1)(iii).

# I
# Background

## A. *Section 21-10A-04 of the Transportation Article*

Title 21, Subtitle 10A of the Transportation Article regulates the towing or removal of vehicles from parking lots, which are defined as "privately owned facilit[ies] consisting of 3 or more spaces for motor vehicle parking" that are "[a]ccessible to the general public" and "intended by the owner of the facility to be used primarily by the owner's customers, clientele, residents, lessees, or guests." TR § 21-10A-01(a). The practice of removing vehicles from these parking lots is sometimes referred to as "trespass towing." *See, e.g.*, Baltimore County Code Ordinances § 21-16-101(j) (2021) (defining "trespass towing"). The provisions in Subtitle 10A apply statewide, though local authorities are not precluded from adopting local laws or regulations that relate to the registration or licensing of those who engage in "the parking, towing or removal, or impounding of vehicles," or from "otherwise regulating" the practice in a "more stringent manner." TR § 21-10A-01(b); *see also id.* § 26-301(b)(3) (providing that any political

subdivision of the State may adopt ordinances and regulations that "[r]egulate the towing of vehicles from publicly owned and privately owned parking lots").

Section 21-10A-04 governs the process of towing and storing a vehicle and, as relevant here, includes limitations on the fees that may be charged in connection with a trespass tow. Currently, the statute provides that:

Unless otherwise set by local law, a person who undertakes the towing or removal of a vehicle from a parking lot:

> (1) May not charge the owner of the vehicle, the owner's agent, the insurer of record, or any secured party more than:

> (i) Twice the amount of the total fees normally charged or authorized by the political subdivision for the public safety impound towing of vehicles;

> (ii) Notwithstanding § 16-207(f)(1) of the Commercial Law Article,[1] the fee normally charged or authorized by the political subdivision from which the vehicle was towed for the daily storage of impounded vehicles;

> (iii) If a political subdivision does not establish a fee limit for the public safety towing, recovery, or storage of impounded vehicles, $250 for towing and recovering a vehicle and $30 per day for vehicle storage; and

> (iv) Subject to subsection (b) of this section, the actual cost of providing notice under this section[.]

TR § 21-10A-04(a)(1).

The statute is relatively new. Prior to 1989, State law did not regulate private towing practices, 73 *Opinions of the Attorney General* 349, 351 n.2 (1988), though there were local laws that did to some extent, *see, e.g.*, *Cade v. Montgomery County*, 83 Md. App. 419, 431 (1990) (holding that a Montgomery County ordinance that

---

[1] That provision, which governs statutory liens on personal property, states that "storage fees of the third party holder may not exceed $5 per day or a total of $300."

regulated trespass towing, including maximum fees, was not unconstitutional); 73 *Opinions of the Attorney General* 246, 248 (1988) (concluding that a Montgomery County ordinance regulating towing of vehicles from private property was valid).

In 1989, a bill was introduced in response to "many well-publicized abuses by towing companies and parking lot owners in the Baltimore area." Floor Report, Senate Jud. Proc. Comm., H.B. 1303, 1989 Leg., Reg. Sess., at 2. These abuses included "exorbitant fees, unauthorized removal, unavailability, and damage to removed vehicles." *Id.* As introduced, the bill provided that persons towing from private parking lots, in Baltimore City and County only, were precluded from charging "more for the towing of the vehicle from the parking lot than the amount normally charged by the political subdivision for the towing of vehicles" or "more than $10 per day for storage." H.B. 1303, 1989 Leg., Reg. Sess. (First Reader). The bill went through a series of amendments as the legislative session progressed and, as finally enacted, provided that "a person who undertakes the towing or removal of a vehicle from a parking lot . . . may not charge . . . more than *twice* the amount *of the total fees* normally charged *or authorized* by the political subdivision for the *impound* towing of vehicles . . . *and . . . except as provided in § 16-207(f)(1) of the Commercial Law Article*, more than *$8* per day for storage." 1989 Md. Laws, ch. 462 (emphases added).[2]

Section 21-10A-04 remained unchanged for nearly two decades after its enactment. Throughout those years, however, there was a fair amount of debate as to what extent the State should regulate the trespass towing business. *See, e.g.*, Report of the Task Force to Study Motor Vehicle Liens, Regulation of Towing Practices, and the Disposition of Unclaimed Vehicles 3 (Jan. 12, 1998) (making recommendations for further regulation of the towing industry). In 2008, the General Assembly created the Task

---

[2] A similar bill was introduced in 1988. That bill simply prohibited charging more than $50 for the towing of a vehicle from a private parking lot. H.B. 306, 1988 Leg., Reg. Sess. (First Reader). House Bill 306 apparently drew some opposition because its provisions would have applied statewide and because, among other things, some felt that "the $50 towing restriction" was "far too low for the cost and operation of sophisticated equipment that must be used on newer model vehicles." Letter of Frederick C. Rummage, Esq., to the Hon. William Horne, Chairman, House Judiciary Comm. (Feb. 4, 1988). Legislative history indicates that the 1989 bill was based largely upon the 1988 bill. Request Form, Bill File on H.B. 1303, 1989 Leg., Reg. Sess. (requesting "reintro[duction of] H.B. 306 (1988) with changes per attachment").

Force to Study Motor Vehicle Towing Practices ("Task Force"), 2008 Md. Laws, ch. 514, and, the following year, extended the Task Force's authority to study State and local laws related to towing practices, 2009 Md. Laws, ch. 704. The Task Force considered a wide variety of issues stemming from motor vehicle towing generally, including "numerous problems" related to trespass towing. *See* A Report to Governor Martin O'Malley and the Maryland General Assembly Regarding Task Force to Study Motor Vehicle Towing Practices 7 (2009) ("Task Force Report").

The Task Force's final report recommended a few changes that are relevant for our purposes. First, the Task Force recommended that Subtitle 10A be amended so that its provisions would apply statewide, rather than only in Baltimore City and Baltimore County. *Id.* at 8-9. Second, the Task Force recommended changing the permissible charge for storage fees from a set fee of $8 per day to instead be equal to the amount authorized by the local jurisdiction for the storage of impounded vehicles, because "[c]apping the daily maximum storage rate for vehicles at the rate allowable by the political subdivision for police initiated towing was thought to be a reasonable limit taking into account economic and geographic differences through the State." *Id.* at 10. Finally, the Task Force recommended imposing a specific maximum limit (of $400 for towing and $35 per day for storage) on the fees that could be charged for trespass towing in those jurisdictions "that do not have a tow rate cap or a daily storage cap" for impound towing. *Id.* In other words, the effect of the proposal would be to "[m]ake[] the tow rate and daily storage rate maximum as set by the political subdivision [for impound towing] *or* in the event that no limit is in place, the limit is $400 for the tow and $35 per day for storage." *Id.* (emphasis added).[3]

Two cross-filed bills based on the recommendations of the Task Force were introduced in 2010. In addition to adopting the Task Force's recommendation that Subtitle 10A of the Transportation Article be made to apply statewide, the proposed legislation amended TR § 21-10A-04 as urged in the Task Force Report by, among other things, adding a provision limiting fees for trespass towing and daily storage to discrete amounts in political subdivisions without "fee limit[s]" for public safety impound towing and storage. *See* S.B. 788, 2010 Leg., Reg. Sess. (First

---

[3] We have not been able to find the exact legislative language that was proposed by the Task Force. Although the table of contents for the Task Force's report indicates that a proposed bill was attached as "Appendix A," that appendix is not attached to any of the copies of the Task Force report that we have been able to locate.

Reader); H.B. 1120, 2010 Leg., Reg. Sess. (First Reader).  During the course of the legislative session, the House Bill was further amended to clarify the status of local laws related to towing and to provide that, in addition to fees for towing and storage, trespass towing services could charge for "the actual cost of providing notice" that the vehicle was towed.  H.B. 1120, 2010 Leg., Reg. Sess. (Third Reader).  Though it appears that the bills were not particularly controversial—H.B. 1120 passed with amendments out of both the House Environmental Matters and Senate Judicial Proceedings Committees with unanimous support—the 2010 session ended without a final version passing both chambers. Substantially similar bills were introduced—and did not pass— during the 2011 legislative session.  *See* S.B. 570, 2011 Leg., Reg. Sess.; H.B. 356, 2011 Leg., Reg. Sess.

Finally, in 2012, some of the Task Force's recommendations became law.  *See* 2012 Md. Laws, ch. 228.  As enacted, the legislation amended Subtitle 10A in three ways relevant to the questions here.

First, the provisions of Subtitle 10A were made to apply statewide, except that those jurisdictions that enact their own laws regulating trespass towing are exempt from the duties and limitations provided in TR § 21-10A-04(a), so long as those local laws are "more stringent" than the State laws regulating "the parking, towing or removal, or impounding of vehicles." 2012 Md. Laws, ch. 228; *see also* TR §§ 21-10A-01(b)(2), 21-10A-04(a).

Second, as recommended by the Task Force, the ordinary maximum daily fee for storage of towed vehicles was changed from no more than $8 per day to "the fee normally charged or authorized by the political subdivision from which the vehicle was towed for the daily storage of impounded vehicles."  2012 Md. Laws, ch. 228.

Third, the Legislature added a provision for those political subdivisions that did not have a "fee limit for the public safety towing, recovery, or storage of impounded vehicles," and precluded trespass towers in those jurisdictions from charging more than $250 for "towing and recovering" a vehicle, and more than $30 per day for storage.  *Id.*  The Task Force had recommended that those default maximums be set at $400 for towing and $35 per day for storage, Task Force Report at 10, but

after some debate, the General Assembly ultimately opted for a lower number.[4]

Since these amendments were enacted in 2012, there have been few changes to § 21-10A-04(a)(1). In 2013, the Legislature amended and limited the notice provisions of the statute so that trespass towers could recoup the actual cost of providing the notice required by TR §§ 21-10A-04(a)(2) and (3), but only in circumstances where the vehicle was not claimed within 48 hours of arriving at the storage facility. 2013 Md. Laws, ch. 388.

Then, in 2021, House Bill 1330 was introduced. As is relevant here, that bill would have explicitly excluded "any administrative fees or additional charges or fees for additional services related to the towing" from the amount of "total fees normally charged or authorized" that TR § 21-10A-04(a)(1)(i) permitted trespass towers in certain jurisdictions to double. H.B. 1330, 2021 Leg., Reg. Sess. (First Reader). At the hearing before the House Environment and Transportation Committee, the bill's sponsor said that the state of the law regarding how much private towing companies could charge to remove cars from private parking lots was "very nebulous." *Hearing on H.B. 1330 Before the House Comm. on Env't & Transp.*, 2021 Leg., Reg. Sess., at 1:52:50 (Mar. 4, 2021) (statement of Del. Marlon Amprey). He explained that, currently, towers were permitted to charge double the amount charged in the city or county where the tow took place, and that if a city or county did not have an "actual fee set," then the cap was $250 for the tow and $30 per day for holding the vehicle. *Id.* at 1:52:59-1:54:06. The problem the bill sought to address was that, as the sponsor explained it, the existing language of TR § 21-10A-04(a) could be read to include administrative and processing fees unique to cities and counties in the amount doubled for trespass towing, and thus, in his opinion, the law was "not a fair law as it's currently constructed." *Id.* at 1:53:11-1:54:28. The sponsor withdrew the bill before second reading.

---

[4] The 2012 law also added a provision permitting trespass towers to charge the "actual cost" of providing the required notice. 2012 Md. Laws, ch. 228. Currently, a trespass tower may charge "the actual cost" of providing the required notice to the owner, any secured party, and the insurer of record, unless the owner, the owner's agent, the insurer of record, or any secured party retakes possession of the vehicles within 48 hours of its arrival at the storage facility. *See* TR §§ 21-10A-04(a)(1)(iv) and (b). The statute also requires the person towing to notify the police department and the owner, any secured party, and the insurer of record that the vehicle was towed. *Id.* §§ 21-10A-04(a)(3) and (4).

### B.   *Baltimore City's Local Towing Laws*

Because TR § 21-10A-04 imposes limits on the fees that may be charged for trespass towing based on the fees charged or authorized by local jurisdictions for public safety *impound* towing, it is necessary to provide some background about how local governments set fees for impound towing.  We will use Baltimore City, which requested this opinion, as an example.

Article 31, Subtitle 31 of the Baltimore City Code contains provisions for "clear streets and impoundment."   Under these provisions, a vehicle may be "impounded" in Baltimore City if it is:  obstructing traffic; illegally parked on "any street, lane, or alley"; abandoned, as defined by State law in the Transportation Article; "involved in an accident or other disablement"; recovered by police after being reported stolen; or parked on a street, lane, or alley without displaying current registration or with its vehicle identification number obscured.  Baltimore City Code, Art. 31, §§ 31-6 through 31-10, 31-12 (2021).[5]  The owner of a vehicle that has been impounded by the City for any of these reasons "may be charged a maximum of $150 for the tow," unless the vehicle is a commercial vehicle or the tow occurs under certain extenuating circumstances, such as if the vehicle must be removed from "an embankment, ditch, waterway, trench, hole, or heavily wooded area." *Id.* § 31-11(a).  "Additional storage fees, administrative fees, and fines for outstanding parking violations may also be charged as allowed by applicable laws and regulations." *Id.* § 31-11(b).  For non-commercial vehicles impounded by the City and towed to its auto pound, storage charges are $50 for the first 48 hours or "any shorter period," and $15 for each 24-hour period or part of a 24-hour period following the first 48 hours. *Id.* § 31-47.

Part 4 of Subtitle 31 provides for impoundment procedures.  Those provisions establish a Towing Division[6] within the Department of Transportation and require the Director of Transportation ("Director") to provide an "auto pound or storage

---

[5] A section in a different part of Subtitle 31 authorizes "impounding or immobilization" of an unattended vehicle where it has three or more "unsatisfied citations" for parking violations and 30 days or more have elapsed since the third citation issued.  Baltimore City Code, Art. 31, § 31-21.

[6] The Towing Division is "responsible for managing the towing of vehicles on all City property, including but not limited to roads, alleys, and public parking lots."  Baltimore City Dep't of Transp., "Towing Division," https://transportation.baltimorecity.gov/towing (last visited March 17, 2022).

area of sufficient size and staffed with sufficient personnel and equipment to receive, hold, and dispose of the motor vehicles delivered to it." *Id.* § 31-41. The Police Commissioner, in turn, is directed to cause the removal of vehicles that are "abandoned, parked, stopped, left unattended in violation of law, or obstructing traffic," *id.* § 31-42(a), apparently using either City-employed towing crews or private towing companies. And for those vehicles that are "stolen, disabled by accident or otherwise, or parked so as to block the entrance to a driveway in an impoundment zone," the Police Commissioner is generally required to use private licensed towers (called medallion towers[7]) to tow the vehicles to the City's auto pound. *Id.* § 31-42(b) (requiring, "except in emergency situations," that the Police Commissioner employ private, "licensed towers or towing companies" to tow such vehicles).[8]

The Code also directs that the specific fees charged for removal of the vehicles under § 31-42(b) by these private, licensed medallion towers "shall be set in advance, arrived at by agreement between the towers, the [Police] Commissioner, and the Director," with any disputes settled by the Commissioner. *Id.* § 31-42(d)(1). But even if the towing "is performed by City forces or vehicles," that same schedule of charges apparently applies, and "[s]uch towing charges will be added to the cost of storage" as specified by the Code. *Id.* § 31-42(d)(2); *see also id.* § 31-47 (providing that storage fees are ordinarily $50 for the first 48 hours or less and $15 for each 24-hour period thereafter). Regardless of whether the towing is done under § 31-42(a) or § 31-42(b), the Code specifies that the maximum fee for the act of towing a non-commercial

---

[7] *See, e.g.*, Baltimore City Code, Art. 31, § 22-1(c) (defining "[m]edallion towing company" to mean a towing company licensed under City law); Baltimore City Dep't of Transp., "Towing Division," https://transportation.baltimorecity.gov/towing (last visited March 17, 2022) (describing medallions as "third-party vendors of City towing services" that "follow the same rules and protocols as City towing crews").

[8] A different subtitle of the Traffic and Transit Article governs the licensing and regulation of the private tow companies employed to tow these vehicles. *See* Baltimore City Code, Art. 31, §§ 22-1 through 22-33. Subtitle 22's provisions relate to "accident towing" of disabled vehicles—defined in the Code to include those found stolen or held for evidence, *id.* § 22-1(b)—and require that towers of disabled vehicles generally be licensed as a "medallion towing company," *id.* § 22-6(a)(1). As we understand it, to the extent that they are the private towers employed under Art. 31, § 31-42(b), these "accident" towers are part of the City's overall impound towing scheme.

vehicle performed under non-extenuating circumstances cannot exceed $150. *See id.* § 31-11(a) (providing the maximum for towing under Subtitle 31, "clear streets and impoundment"), § 22-9(b) (providing the maximum fee for "accident" towing).[9]

The $150 fee limitation found in both § 31-11 and § 22-9(b) is relatively new, having been added in 2014. *See* City of Baltimore, Ordinance No. 14-266 (2014) (adding those limitations). Before that, the actual fees charged for the impound towing of vehicles were still, as they are now, a product of an agreement between City officials and the private towers that were sometimes employed, but that agreement was apparently unrestrained by any limitations in the Code as to what those fees might be. *See* Baltimore City Code, Art. 31, § 95 (1983 Repl. Vol.). As is the case now, that same schedule of charges applied "[i]n the event towing is performed by City forces or vehicles and no employment of towers [was] necessary." *Id.*

Currently, it is our understanding that both the City and private towers charge $130 to tow vehicles impounded from locations east of Charles Street and $140 to tow vehicles impounded from locations west of Charles Street. Baltimore City Dep't of Transp., "Towing Fees," https://transportation.baltimorecity.gov/towing/fees (last visited March 18, 2022); *see also* Memorandum on City Council Bill No. 14-0350 from William M. Johnson, Director, Dep't of Transp., to the President and Members of the City Council (June 27, 2014) (reporting that both private "accident" towers and the City's fleet of towing vehicles charge either $130 or $140 per tow, depending on the location). These fees apparently represent the amounts negotiated between the private towers licensed to perform impounds for the City and City officials, and subsequently approved by the City's Board of Estimates, which has authority over the City's contracts for services. *See* Charter of Baltimore City, Art. VI, § 11(a), (d); Baltimore City Code, Art. 31, § 31-42(d)(1).

In addition to the local impound towing laws discussed above, Baltimore City also regulates the licensure of and, to a certain extent, the fees charged by private companies engaged in trespass towing. *See generally* Baltimore City Code, Art. 15, §§ 22-1 through 22-18. The Subtitle creates a Board of Licenses for Towing Services ("Tow Board") comprising City officials,

---

[9] To be clear, that $150 maximum does not apply to the "[a]dditional storage fees, administrative fees, and fines for outstanding parking violations" that "may also be charged as allowed by applicable laws and regulations" under § 31-42(a). Baltimore City Code, Art. 31, § 31-11(b).

representatives from the property management and trespass towing industries, and one citizen. *Id.* § 22-2. The Tow Board is authorized to adopt rules and regulations to "carry out the purpose and intent" of Subtitle 22, *id.* § 22-3(a), and to oversee the fees that trespass towing companies charge, *see id.* § 22-8 (requiring applicants for trespass towing licenses to "file with the Board a schedule setting forth the applicant's proposed charges for towing and for any services incident to towing," and precluding any change in charges "without filing with the Board an amended schedule showing the charges proposed"). But the Tow Board is not empowered to set, on its own, the fees charged by private trespass towers; rather, those fees are governed by TR § 21-10A-04, unless and until the City opts to adopt its own ordinances more stringently regulating trespass towing fees. *See* TR §§ 21-10A-01(b); 26-301(b)(3).[10]

## II
## Analysis

Your question is one of statutory interpretation, the ultimate goal of which is to "ascertain and effectuate the General Assembly's purpose and intent when it enacted the statute." *Wheeling v. Selene Finance LP*, 473 Md. 356, 376 (2021) (citation omitted). To achieve that goal, we look first to the "normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Berry v. McQueen*, 469 Md. 674, 687 (2020). Generally, where the language of a statute is unambiguous, we give effect to the statute as written. *Kushell v. Department of Nat. Res.*, 385 Md. 563, 577 (2005). At the same time, it may also be "beneficial to review the legislative history both as a check on [a] plain language reading and to eliminate alternate theories of legislative intent." *Washington Gas Light Co. v. Maryland Pub. Serv. Comm'n*, 460 Md. 667, 686 (2018). A meaningful review of a statute's legislative history will employ all available "resources and tools of statutory construction," *Watts v. State*, 457 Md. 419, 430 (2018), including "the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various

---

[10] In 2021, several Baltimore City councilmembers introduced a bill that would amend the City's trespass towing laws in several ways, including by placing a $250 limit on the fee that trespass towers are permitted to charge for towing services. *See* City of Baltimore, Council Bill No. 21-0125 (First Reader).

competing constructions," *Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 295 (2017).

## A. *What Fees May be Doubled*

Your first question is: which of the towing-related fees in TR § 21-10A-04 may be doubled?  Under the statute, a trespass tower generally may not charge "more than" certain amounts that are specified in an enumerated list.  TR § 21-10A-04(a)(1).  That enumerated list, in turn, refers to three separate types of charges related to the act of towing a vehicle, the subsequent storage of a towed vehicle, and the provision of notice that a vehicle was towed and stored.  More specifically, a trespass tower ordinarily may charge (1) "*twice* the amount of the total fees normally charged or authorized by the political subdivision for the public safety impound *towing* of vehicles," (2) "the fee normally charged or authorized by the political subdivision from which the vehicle was towed for the *daily storage* of impounded vehicles," and (3) for the "*actual cost* of providing *notice* under th[e] section."  *Id.* (emphases added).

As an initial matter, it is clear from the text and structure of the statute that the General Assembly did not intend to permit the doubling of charges for storage of impounded vehicles or for notice as part of the "total fees" for impound towing.  That is because the word "twice" is used only to modify the fees "normally charged or authorized" for the *towing* of vehicles as provided in subparagraph (a)(1)(i) and does not appear in the later subparagraphs that refer separately to charges for storage and notice.  If the General Assembly had intended the storage and notice fees to be doubled, then it would have included "twice" in those later subparagraphs (or would have used the word to modify paragraph (a)(1) in its entirety).  We can say with a high degree of confidence, therefore, that storage and notice fees are *not* included in the "total fees" that are to be doubled.  Instead, the total fees for impound *towing* are doubled and then added to the *non*-doubled storage fee (if applicable) that is normally charged or authorized for impounded vehicles in the jurisdiction and the actual cost of notice (if applicable) to determine the overall maximum fee that may be charged for trespass towing.[11]

---

[11] The legislative history also supports this view.  A bill introduced in 1988, as well as an early draft of the one introduced in 1989, set discrete monetary limits on what trespass towers were permitted to charge.  The 1988 bill allowed trespass towers statewide to charge no more than $50 "for the towing of the vehicle from the parking lot," and made no

The text of the statute is less clear, however, as to what other fees related to the "public safety impound towing of vehicles" might be included in the "total fees" that may be doubled under TR § 21-10A-04(a)(1)(i). For example, should Baltimore City's "administrative" fee for impound towing be included in the "total fees" that are doubled to determine the maximum fee for trespass towing? *See* Baltimore City Code, Art. 31, § 31-11(b). Or what about fines for outstanding parking violations that vehicle owners might have to pay before recovering their vehicles from the impound lot? *See id.* The statutory language is not entirely clear on those points, *see* Letter from Jeremy M. McCoy, Assistant Attorney General, to Delegate Brooke E. Lierman, at 3 (Dec. 30, 2020) (explaining that "total fees" could arguably include administrative fees)[12], so we turn to the legislative history and the general purpose of the statutory scheme for guidance.

To start, it is important to remember that in 1989, when what became TR § 21-10A-04(a)(1) was introduced and enacted, its provisions applied only to Baltimore City and Baltimore County. It is thus reasonable to assume that the contemporaneous "impound" towing practices of those jurisdictions informed the statute as originally enacted in 1989. Indeed, that assumption finds support in the legislative history. While the bill was being considered during the 1989 session, for example, it was amended so that towers could not charge more than "*twice* the amount normally charged *or authorized* by the political subdivision for the *impound* towing of vehicles." H.B. 1303, 1989 Leg., Reg. Sess. (Second Reader) (emphases added). The addition of "or authorized" and "impound" to the text of the bill changed the standard for allowable trespass towing fees so that it mirrored the impound practices outlined in the Baltimore City Code, under which either City forces or private towers might be called upon to impound vehicles. *See* Baltimore City Code, Art. 31, § 95 (1983 Repl. Vol.). That is, if the "City's forces" performed the impound,

reference whatsoever to charges for storage. H.B. 306, 1988 Leg., Reg. Sess. (First Reader). Handwritten notes on an early draft of House Bill 1303 of 1989, meanwhile, reveal the sponsor's decision to raise the maximum allowable fee for towing in Baltimore City and County to $75, and to permit charges of "no more than $10 per day for storage." Del. Curt Anderson's Work Papers, Bill File on H.B. 1303, 1989 Leg., Reg. Sess. The intent to treat towing and storage as separate and distinct chargeable categories is thus clear from the very beginning.

[12] Although that advice letter also left open the question of whether fees for storage and notice might be included within the "total fees" that may be doubled, we have already concluded above that such fees may not be doubled.

there would be an amount "normally charged" by the City; if private towers performed the impound, the City "authorized" those towers to charge a pre-determined amount.[13]

To understand what is meant by the "*total fees* normally charged or authorized" for impound towing, then, we look to the impound towing practices of Baltimore City and Baltimore County as they existed in 1989. We will focus here on Baltimore City, as its practices are the most helpful in understanding the meaning of the statute.

The City Code, for its part, provided at the time that "[t]he *towing charges* shall be set in advance, arrived at by agreement by the towers, the [Police] Commissioner and the Director," and that "[i]n the event towing is performed by City forces or vehicles and no employment of towers becomes necessary, the same *schedule of charges* shall apply," and would be "added to the cost of storage" specified by the Code. Baltimore City Code, Art. 31, § 95 (1983 Repl. Vol.) (emphases added).

That the City Code referred to a "schedule of charges" for the act of towing a vehicle, and used the term to refer back to the "towing charges" mentioned earlier in the same section, suggests that there was not one lump sum fee charged for the act of towing but rather an itemized list of distinct fees that are all related to the act of towing a vehicle. *See Black's Law Dictionary* (11th ed. 2019) (defining "schedule" as a "written list or inventory; esp., a statement that is attached to a document and that gives a detailed showing of the matters referred to in the document"). There might have been, for example, a flat fee charged in each case for responding to tow a vehicle, and then a certain amount charged per mile towed. *Cf.* Baltimore City Code, Art. 31, § 22-9(a) (charges for "[accident] towing and for services incident to towing" may be "measured by mileage, time, and type of service"); *id.* Art. 15,

---

[13] The Baltimore County Code contained a similar scheme. Under Baltimore County's ordinances at the time, the Chief of Police was authorized to "take possession of and remove any motor vehicle parked upon any boulevard or through street in the county during the hours when parking on any such boulevard or through street is prohibited." Baltimore County Code, § 17-27(a) (1978). To do so, the Chief of Police was further "authorized to seize and remove motor vehicles *by means of county equipment or by contract*," and to store such vehicles "either upon county property or upon private property by suitable contract; provided, that any contract for the removal or storage of impounded motor vehicles [was] entered into pursuant to the purchasing provisions of th[e] Code." *Id.* § 17-27(c) (1978 & 1988/89 Supp.) (emphasis added).

§ 22-8(b) (charges for trespass towing may be based on "mileage time, and type of service," or measured on a "flat fee basis").[14]

Documentation of contemporary towing rates found in the bill file for H.B. 306, introduced in 1988, supports this understanding of how fees for a tow itself were broken down. *See* "Current Metropolitan Area Towing Rates," Bill File on H.B. 306, 1988 Leg., Reg. Sess. (providing a list of total fees charged by various towing companies, including two in the Baltimore area, and indicating the breakdown of that total for certain companies); *see also Patton v. Wells Fargo Fin. Md.*, 437 Md. 83, 99-100 (2014) (relying on documents found in a bill file, including written testimony and copies of federal legislation on the same topic as the State bill); *Ford Motor Credit Co. v. Roberson*, 420 Md. 649, 666 n.13 (2011) (relying on a Department of Legislative Services chart in the bill file). According to that comparison, some companies charged only a per-mile fee, while others appear to have charged a flat fee (often referred to in industry parlance as a hookup fee) plus mileage.

We recognize that, as currently written, the City Code allows for "[a]dditional storage fees, administrative fees, and fines for outstanding parking violations" to be charged on top of the fee for impound towing, Baltimore City Code, Art. 31, § 31-11(b), and that this provision is contained in the section governing "maximum charges." Based on this provision, one might argue that *all* of these fees comprise the "total fees" charged or authorized for a public safety impound tow and that, therefore, in Baltimore City, trespass towers are permitted to double not only fees for towing, but also these "additional storage fees, administrative fees, and fines for outstanding parking violations."

But when § 21-10A-04 was enacted in 1989, the City Code contained no such provision. Instead, the City Code merely directed towers, the Commissioner, and the Director to set the "towing charges" in advance and allowed the City to add those towing charges to the separate cost of storage. Baltimore City

---

[14] The bill file for H.B. 1303, introduced in 1989, contains a copy of the local bill introduced by Councilmember Ambridge that created the Tow Board and included this provision addressing the approval and measuring of charges. *See* Draft Bill Establishing Baltimore City Tow Board, Bill File on H.B. 1303, 1989 Leg., Reg. Sess. Thus, the members of the General Assembly were presumably aware of this proposed measure of charges—i.e., by "mileage, time, and type of service."

Code, Art. 31, § 95 (1983 Repl. Vol.).[15] That is important because the language of TR § 21-10A-04(a)(1) has, since its original enactment, referred to charges for "impound *towing*," not simply "impoundment" or "impounding" in general. Indeed, it is worth noting that, today, the City Code continues to distinguish between the charges for impound "towing," Art. 31, § 31-11(a), and "other charges," *id.* § 31-11(b), which together comprise the maximum charges for an "impoundment" governed by Subtitle 31 as a whole.

What is more, given H.B. 1303's purpose of combating "many well-publicized abuses by towing companies and parking lot owners in the Baltimore area," including the charging of "exorbitant fees," Floor Report, Senate Jud. Proc. Comm., H.B. 1303, 1989 Leg., Reg. Sess., at 2, it would defy common sense to suggest that the Legislature meant to authorize trespass towing companies to increase their fees based on a doubling of impound charges, such as fines owed to the City for parking violations, that are entirely unrelated to the types of costs incurred by private towers. *See Rose v. Fox Pool Corp.*, 335 Md. 351, 358-59 (1994) (statutes must be "construed in accordance with [their] general purposes and policies").[16]

---

[15] The bill file for Senate Bill 570, introduced in 2011, contains a chart that compared the maximum trespass towing rates permitted in counties that licensed trespass towers, and we recognize that the maximum rate listed in that chart for trespass towing in Baltimore City appears to have been calculated by doubling each of the "maximum charges" related to impounding, including the administrative fee, and then adding them together. *See* "Maximum Trespass Towing Rates," Bill File on S.B. 570, 2011 Leg., Reg. Sess. From this, one might argue that the Legislature was aware that all of these fees were being included in the "total fees" that were doubled under the statute as currently constructed and that its failure to take corrective action is evidence of its intent to permit such fee practices. However, the chart neither indicates how the maximums were calculated, nor provides references to the local impound towing laws ostensibly used to calculate those rates. In other words, it would not have been clear to a legislator reading the chart that the maximum fee listed for Baltimore City was calculated by doubling all of the fees, including the administrative fees. We therefore do not consider the chart as convincing evidence that the Legislature was on notice that Baltimore City was doubling *all* fees associated with the entire process of impounding a vehicle and, by failing to further clarify the term "total fees," gave tacit approval to the practice.

[16] In fact, it is especially clear that fines for traffic or parking violations would not be included within the fees that are doubled under TR § 21-10A-04(a)(1)(i), because those types of charges do not arise in a normal tow—but rather only under certain limited circumstances— they would not be part of the fees "*normally* charged or authorized." TR § 21-10A-04(a)(1)(i) (emphasis added).

In sum, because both the text of TR § 21-10A-04(a)(1) and its legislative history make plain the General Assembly's intent to treat fees for towing as separate from fees for storage and notice (and to treat them differently for purposes of calculating allowable charges for trespass towing), we conclude that the "total fees normally charged or authorized" do not include fees for storage or notice, nor fines owed for violating traffic or parking laws. Similarly, as to administrative fees, although it is not entirely clear from the text of the statute itself, the legislative history leads us to conclude that the Legislature likely did not intend to include, in the "total fees" doubled under TR § 21-10A-04(a)(1)(i), administrative fees charged by a political subdivision for impounding a vehicle.[17] Rather, it appears that the intent was for only those fees directly related to the act of towing a vehicle to be doubled pursuant to TR § 21-10A-04(a)(1)(i).

### B.    Meaning of "Normally Charged or Authorized"

Your second question, about the meaning of and relationship between the phrases "fees normally charged or authorized" and "fee limit," is more difficult to answer. As explained above, the maximum fees that may be charged for trespass towing in a jurisdiction are ordinarily determined based on the fees "normally charged or authorized" in that local jurisdiction for public safety impound towing and the storage of an impounded vehicle. TR § 21-10A-04(a)(1)(i), (ii). But the statute provides for a different

---

[17] The bill introduced in 2021, which would have explicitly excluded "any administrative fees or additional charges or fees for additional services related to the towing," from the amount that could be doubled under TR § 21-10A-04(a)(1)(i), could arguably be taken as evidence that at least one legislator believed that the subsection as written permits the doubling of the administrative fees charged by a political subdivision for public safety impound towing. H.B. 1330, 2021 Leg., Reg. Sess. (First Reader); *see also* Fiscal & Policy Note, H.B. 1330, 2021 Leg., Reg. Sess., at 1 ("[T]he bill alters the amount a person may charge for towing by specifying that the total permissible charges authorized under State law exclude any administrative fees or additional charges or fees for additional services related to the towing."). However, although the Legislature's failure to pass a bill can be "significant where bills have repeatedly been introduced in the General Assembly to accomplish a particular result, and where the General Assembly has persistently refused to enact such bills," *Moore v. State*, 388 Md. 623, 641 (2005), here we have neither repeated introductions of this language nor a persistent refusal by the General Assembly to adopt it. Rather, the bill—which represents the first time any limiting or clarifying language related to "total fees" was proposed—was withdrawn by its sponsor before the measure was even considered by the entire General Assembly.

rule if the local jurisdiction does not have a so-called "fee limit" for public safety towing: "If a political subdivision does not establish a *fee limit* for the public safety towing, recovery, or storage of impounded vehicles, [the maximum charges are] $250 for towing and recovering a vehicle and $30 per day for vehicle storage." TR § 21-10A-04(a)(1)(iii) (emphasis added). So the question is—what does "fee limit" mean in this context? Is it the same as the "fee[] normally charged or authorized" in the jurisdiction or does it refer to something else?

Before we decide that question, however, we first need to understand what the phrase "fees normally charged or authorized" was intended to mean. As explained above, *see* Part II.A, *supra*, our understanding is that an amount "normally charged" refers to a fee when the political subdivision itself is performing an impound-related tow, while an amount "normally . . . authorized" refers to a fee when the political subdivision sets or approves the fees charged by private companies licensed to do the impound towing. But, either way, the point is that the local jurisdiction is setting limitations, through legislative enactment or through some other formal means, on the fees that may be charged for public safety impound towing. That is, the "normal" fees to be charged or authorized are subject to oversight and control by the government; they are not merely the product of the practices of private towing companies that, though they might converge around an amount that is "normal" to charge for a public safety impound tow, are nevertheless unrestrained. In other words, the fee "normally charged or authorized" in a jurisdiction is the predetermined, fixed amount the jurisdiction charges (or authorizes private towers to charge) for an ordinary public safety impound-related tow that takes place under normal circumstances. Although the actual fee for a particular impound tow might be higher or lower than ordinary under certain circumstances (such as if there is a surcharge for the towing of a vehicle out of a ditch), the fee "normally charged or authorized" is the set fee for a *normal* tow.[18]

---

[18] Unfortunately, given the varied towing practices around the State, it will not always be easy to determine this amount in practice. In Baltimore City, for example, the amount "normally charged or authorized" by the City for impound towing appears to be $130 for vehicles east of Charles Street and $140 for vehicles west of Charles Street. *See* Baltimore City Department of Transportation, Towing Fees, https://transportation.baltimorecity.gov/towing/fees (last visited March 18, 2022). Assuming that the fee "normally charged or authorized" is either $130 or $140, however, there is no guidance in the statute about how to choose between the two. While the City is in the best position to

With that understanding, we return to the question of whether "fees normally charged or authorized" in subparagraph (a)(1)(i) means the same thing as "fee limit[s]" in subparagraph (a)(1)(iii). At first blush, one's instinct might be that the two concepts are entirely different. In ordinary parlance, after all, the term "fee limit" implies a maximum allowable fee, while the amount "*normally* charged or authorized by the political subdivision" might well be lower than that maximum allowable fee. It is also true that "when a legislature uses different words, especially in the same section or in a part of the statute that deals with the same subject, it usually intends different things." *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 223 (2003).

At the same time, neither phrase is specifically defined, and the statutory scheme becomes more difficult to follow if the fee "normally charged or authorized by a political subdivision" does not qualify as a "fee limit" under subparagraph (a)(1)(iii). If read that way, the fee normally charged or authorized by the local jurisdiction for impound towing (which the statutory design suggests is the usual basis for calculating the allowable fees for trespass towing) becomes entirely irrelevant unless the jurisdiction *also* has an overall maximum cap on fees for impound towing. It is not clear to us that the General Assembly intended that result, especially given that having a set fee that is normally charged or authorized already imposes a substantial limitation on the fees that can permissibly be assessed for impound towing. It is thus possible the term "fee limit" was meant to encompass a variety of ways in which a local jurisdiction might set limitations on the fees that can be charged for public safety impound towing. In other words, perhaps the General Assembly meant "a fee limit" to refer more generally to a limitation on the fees that can be assessed for impound towing, one of which might be to have a predetermined, fixed amount that is "normally charged or authorized" by the local jurisdiction.

---

determine which fee is properly characterized as the fee "normally charged or authorized," we note that the City's main impound lot is located at 6700 Pulaski Highway, far on the eastern side of the City, and it appears that this location accounts for the higher fee for towing vehicles from the western side of the City. *See* Memorandum on City Council Bill No. 14-0350 from William M. Johnson, Director, Dep't of Transportation, to the President and Members of the City Council (June 27, 2014) (explaining that the fee differential "accommodates for the extended distance of the tow from the west side of the City to the tow yards on the east side"). Our sense, then, is that $130 is more likely the "normal" fee, and that vehicles located further from the auto pound are, in effect, assessed an additional $10 to compensate for the longer haul.

In light of that ambiguity, we turn to the legislative history for further guidance. To begin, it is important to remember that Senate Bill 401 was largely based on recommendations made by the towing practices Task Force in 2008. *See* Floor Report, Senate Jud. Proc. Comm., S.B. 401, 2012 Leg., Reg. Sess., at 1 ("This bill generally implements the Task Force to Study Motor Vehicle Towing Practices' recommended legislative changes relating primarily to the regulation of nonconsensual towing of vehicles from private property and the disposition of towed vehicles.").

A close reading of the Task Force Report suggests that the term "fee limit" did not mean only a legislatively enacted maximum fee, but rather was intended to encompass a broader understanding of what it means to limit fees that may be charged, which would include the "fees normally charged or authorized" by a political subdivision, at least as we understand that concept. More specifically, the Task Force indicated that it had been "uncomfortable with potential areas that do not have a tow rate cap or a daily storage rate cap," and that "[t]o address this, the Task Force voted . . . in favor of placing maximum limits, *only where there is no local cap*, of $400 for the tow and $35 per day for storage." Task Force Report at 10 (emphasis added). In 2008 and 2009, when the Task Force was meeting and deliberating, Baltimore City did not appear to have any sort of set, maximum "cap" in its code for impound or any other form of towing. *See* Baltimore City Code, Art. 31, § 95 (1983 Repl. Vol.) (fees for impound towing set by agreement between towers, the Police Commissioner, and the Director of Public Works, with no limitation in the Code as to how high those fees could be).[19] Yet, earlier in its report, the Task Force indicated that there had been "consensus that [Subtitle 10A] worked relatively well in Baltimore City and County," Task Force Report at 7, which would suggest that Baltimore City and County were not among the "cap"-lacking areas causing discomfort and, further, that the Task Force expected that TR § 21-10A-04(a)(1)(i) and (ii)—and not the new provision for jurisdictions without a "fee limit"—would continue to apply in Baltimore City and County.

---

[19] Arguably, the City's code did have a cap for fees related to *storage* of impounded vehicles. *See* Baltimore City Code, Art. 31, § 96 (1983 Repl. Vol.) (storage charges for non-commercial vehicles are $15 for the first 48 hours and $4 per day thereafter). Section 31-11(a) of Article 31, which provides that the owner of an impounded vehicle may be charged a maximum of $150 for impound-related towing unless the vehicle requires certain "specialized and exceptional services" for removal, was not added to the Code until 2014.

The Task Force Report also sheds light on how the Task Force viewed the relationship between the concepts embodied by the phrases "fees normally charged or authorized" and "fee limit." Throughout its report, the Task Force referred to the rates normally charged or authorized in the jurisdiction as a type of "limit." For example, the Task Force explained that its proposal "ma[de] the tow rate and daily storage rate maximum as set by the political subdivision [i.e., based on the amount normally charged or authorized by the jurisdiction] or in the event that no *limit* is in place, the limit is $400 for the tow and $35 per day for storage." Task Force Report at 10 (emphasis added). Similarly, the report also explained the recommended changes to subsection (a)(1)(ii)'s storage fees provision: "Capping the daily maximum storage rate for vehicles at *the rate allowable by the political subdivision for police initiated towing* was thought to be a reasonable *limit* taking into account economic and geographic differences throughout the State." *Id.* (emphases added). Thus, it seems that the Task Force understood the word "limit" to describe both the concept embodied by TR § 21-10A-04(a)(1)(i)'s "fees normally charged or authorized" language *and* the substantive recommendation later articulated as a "fee limit" in TR § 21-10A-04(a)(1)(iii). This, in turn, suggests that the Task Force might have viewed these two phrases—"fees normally charged or authorized" and "fee limit"— as conceptually interchangeable or that, at least, it viewed the "fees normally charged or authorized" as a *type* of "fee limit."

The legislative history of the bills subsequently introduced to implement the Task Force's recommendations also suggests that the General Assembly had the same general understanding. For example, the Senate Floor Report related to the 2012 bill advised that "[t]he bill establishes the towing and daily storage rates based on the *limits* set by the political subdivision for a public safety tow from which the vehicle was towed, or if no *limit* is established, no more than $250 for towing or $30 per day for storage." Floor Report, Senate Jud. Proc. Comm., S.B. 401, 2012 Leg., Reg. Sess., at 2 (emphases added); *see also* Floor Report, Env't Matters Comm., H.B. 1120, 2010 Leg., Reg. Sess., at 2 (containing nearly identical language). That summary is illuminating because the phrase "the limits set by the political subdivision" in the summary clearly refers to the fees that are "normally charged or authorized" by the jurisdiction—because those were the only possible "limits" found in TR § 21-10A-04(a) at the time—and suggests that the default maximum in subparagraph (a)(1)(iii) is triggered only if there are no such "limits." Similarly, at a committee hearing on the 2012 legislation that ultimately became law, the sponsor explained that the fees for trespass towing were largely "left to local

jurisdictions," and that the bill would only apply if there were no "action" at the local level. *Hearing on H.B. 160 Before the House Comm. on Env't Matters*, 2012 Leg., Reg. Sess., at 00:04:20 (Feb. 21, 2012) (statement of Del. Doyle Niemann).

These statements suggest that subsection (a)(1)(iii) was added to set default limits for those jurisdictions whose fees would not have been regulated at the local level, either by stricter trespass towing laws or via the locality's "limits" on fees for public safety impound towing. Although one way for a political subdivision to achieve such "limits" might be by codifying a maximum allowable charge for impound towing, the Legislature appeared to recognize that another way was by having set fees that were "normally charged or authorized" by the government for those tows. The statements contained in the floor reports—that the tow and storage rates were "based on the *limits* set by the political subdivision for a public safety tow"—further support the conclusion that the General Assembly meant the term "fee limit" in TR § 21-10A-04(a)(1)(iii) to include the "fees normally charged or authorized" found in TR § 21-10A-04(a)(1)(i) and (ii). Thus, the history of TR § 21-10A-04(a) reveals that legislators (and those with knowledge of the trespass towing industry) have treated the phrase "fees normally charged or authorized by a political subdivision" as a type of "fee limit" for purposes of subsection (a)(1)(iii), despite the fact that the two terms might not, in ordinary usage, be synonymous.

In fact, it appears that the Legislature may have contemplated three broad categories of political subdivisions that would be subject to TR § 21-10A-04(a)[20] and that the default fees in subparagraph (a)(1)(iii)'s "fee limit" provision were intended to apply only to the third category. The first category would include those jurisdictions with maximum limits for public safety impound towing and storage set by code or some sort of regulation with legal force. These jurisdictions would have had clear "fee limits" for impound towing and thus would not have been considered subject to the default limits for trespass towing in TR § 21-10A-04(a)(1)(iii).[21]

---

[20] As a reminder, a local jurisdiction would not be subject to TR § 21-10A-04(a) if it chose to adopt its own more stringent limits on trespass fees via local law. *See* TR § 21-10A-01(b)(2); *see also* TR § 21-10A-04(a) (providing that the fees limitation on trespass towing apply "[u]nless otherwise set by local law").

[21] In these jurisdictions, there might be a question as to which impound towing fee is the fee "normally charged or authorized" and,

The second category would comprise jurisdictions that might not have had discrete monetary limits set in their codes for public safety impound towing but did have other means of formally limiting and fixing the fees that were charged for impounding vehicles—for example, by having predetermined fees and requiring, as Baltimore City did in 2012 and still does, that the fees be negotiated by the private towers and the City and ultimately approved by a spending board—and thereby creating a fee that was "normally charged or authorized." *See* Baltimore City Code, Art. 31, § 31-42(d) (2000 & 2008 Supp.). Because the City had been subject to TR § 21-10A-04 since 1989, and the members of the Task Force appeared to agree that the law was working "relatively well," the City and any other jurisdictions with similar schemes to determine and fix fees that are "normally charged or authorized" for public safety impound towing likely would also not have been considered subject to subsection (a)(1)(iii).

Third would be those jurisdictions that did not set any formal, predetermined limits on the amount of the fees charged for public safety impound towing and thus have neither a maximum fee nor a fee "normally charged or authorized" as we understand that term. Although we have not reviewed every local jurisdiction's towing scheme and cannot categorize them with certainty, these were likely the types of jurisdictions that the Task Force had in mind when it recommended that the General Assembly add TR § 21-10A-04(a)(1)(iii)'s "fee limit" provision. *Cf. Hearing on H.B. 160 Before the House Comm. on Env't Matters*, 2012 Leg., Reg. Sess., at 00:04:20 (Feb. 21, 2012) (statement of Del. Doyle Niemann) (explaining that the default limits in the bill would only apply if there were no "action" at the local level). Read this way, the "fees normally charged or authorized," and subject to some sort of formal process for determining and fixing those fees, effectively function as a type of "fee limit" under TR § 21-10A-04(a)(1)(iii).

---

thus, doubled for purposes of determining the maximum fee for trespass towing. Assuming that there is a maximum fee for public safety impound towing and nothing else in the jurisdiction's regime would establish a fee lower than the maximum as the fee "normally" charged or authorized for impounding towing and storage, that codified maximum would presumably be the amount "normally charged or authorized" used to calculate permissible trespass towing fees under TR § 21-10A-04(a)(1), as the jurisdiction has effectively "authorized" a fee to be charged up to the maximum amount. But, in jurisdictions that have both a maximum fee limit *and* a lower amount that is "normally charged or authorized," the lower amount would be used to calculate the maximum fee for the trespass tow.

### III
### Conclusion

In our opinion, it is clear that TR § 21-10A-04(a)(1)(i) does not permit the doubling of fees for storage or notice related to impounding a vehicle, or any fines that the local jurisdiction imposes for traffic violations. Although it is less clear, we also conclude that the General Assembly likely did not intend that administrative fees charged by a political subdivision for public safety impounding be included in the "total fees" doubled under TR § 21-10A-04(a)(1).

As to your second question, although not free from doubt, our conclusion is that the General Assembly intended a "fee normally charged or authorized" to operate as a type of fee limit; thus, a jurisdiction that has set "fees normally charged or authorized" for public safety towing within the jurisdiction has a "fee limit" within the meaning of TR § 21-10A-04(a).

> Brian E. Frosh
> Attorney General of Maryland
>
> Sara Klemm
> Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice